UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARK EDWARD MEADOWS, | ) | Case No. 5:18CV1024 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | <u>MEMORANDUM AND ORDER</u> |

Plaintiff Mark Edward Meadows ("Meadows" or "claimant") challenges the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for a period of disability ("POD"), disability insurance benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  The issue before the court is whether the final decision of the Commissioner is

supported by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the

Commissioner's final decision is affirmed.

## I.  PROCEDURAL HISTORY

On December 16, 2014, Meadows filed applications for POD and DIB, and on December

22, 2014, for SSI benefits, with both applications alleging disability beginning October 20, 2012.

(R. 10, Transcript ("tr."), at 93, 343-344, 345-348, 365-383.)  Meadows's applications were

denied initially and upon reconsideration.  (R. 10, tr., at 165-212, 213-262, 263-266.)  Thereafter,

Meadows filed a request for a hearing before an administrative law judge ("ALJ"). (R. 10, tr., at 288-289.)

The ALJ held the hearing on June 1, 2017. (R. 10, tr., at 114-163.) Meadows appeared at the hearing, was represented by counsel, and testified. (*Id.* at 116, 122-149.) A vocational expert ("VE") attended the hearing and provided testimony. (*Id.* at 116, 150-152.) On August 16, 2017, the ALJ determined Meadows was not disabled, after applying the standard five-step sequential analysis. (R. 10, tr., at 93-105; *see generally* 20 C.F.R. §§ 404.1520(a) and 416.920(a).)

The Appeals Council denied Meadows's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (R. 10, tr., at 1-4.) Meadows's complaint in this court seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). The parties have completed briefing in this case. Meadows presents two legal issues for the court's review, asserting the ALJ erred when evaluating the opinions and statements from treating sources and did not meet his burden at Step Five of the sequential analysis. (R. 11, PageID #: 1871.)

## II. PERSONAL BACKGROUND INFORMATION

Meadows was born in 1986, and was 26 years old on the alleged disability onset date. (R. 10, tr., at 104, 123, 343.) Accordingly, he was considered a younger individual age 18-49 for Social Security purposes. *See* 20 C.F.R. §§ 404.1563, 416.963. Meadows has a limited education and is able to communicate in English. (R. 10, tr., at 104, 125, 369.) He has past work as a cashier. (R. 10, tr., at 104, 150.)

III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Meadows's brief alleging error by the ALJ.  As stated above, Meadows filed applications for POD and DIB on December 16, 2014, and an application for SSI benefits on December 22, 2014.  (R. 10, tr., at 93, 343-344, 345-348.)  He listed the physical or mental conditions that limit his ability to work as: "back injury, [arthritis], [depression], anxiety, neurocardiogenic syncope, poor education."  *Id.* at 370.

State agency reviewing physician Esberdado Villanueva, M.D., prepared a physical residual functional capacity ("RFC") assessment on March 5, 2015.  (R. 10, tr., at 187-188, 205-205.)  Dr. Villanueva determined Meadows was capable of light work, with the ability to stand or walk about six hours, and the ability to sit for six hours, of an eight-hour workday.  *Id.* at 187.  Claimant's ability to push or pull is unlimited; and Dr. Villanueva opined that Meadows is limited to light exertional work due to his chronic back pain.  *Id.*  The doctor stated that Meadows can occasionally climb ramps or stairs, and can never climb ladders, ropes, or scaffolds.  He can frequently balance, stoop, kneel, crouch, or crawl.  *Id.*  Dr. Villanueva opined that Meadows needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and all exposure to hazards.  *Id.* at 188.  On reconsideration dated November 24, 2015, state agency reviewing physician Robert Wysokinski, M.D., largely concurred with Dr.

---

[1]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

Villanueva's physical RFC, with the exception that claimant can frequently balance or stoop, but only occasionally kneel, crouch, or crawl. (R. 10, tr., at 229-231, 253-255.)

On April 22, 2015, consultative psychologist Robert F. Dallara, Jr., Ph.D., completed a psychological evaluation. (R. 10., tr., at 741-745.) Dr. Dallara's evaluation relied primarily on Meadows's self report, although the psychologist did review a small number of medical records. *Id.* at 741. Meadows indicated that his chief complaint involved difficulties working due to back issues, heart issues, and problems with his left knee. *Id.* Meadows reported that he had been hospitalized "for psychiatric reasons" for one week in West Virginia at age 22, and that he had received outpatient psychiatric treatment there for a year. *Id.* at 742. Meadows denied any other history of treatment by a mental health professional. *Id.* Meadows told Dr. Dallara that he had depression most of his life. (R. 10, tr., at 743.) He also reported sleep difficulties. *Id.* The psychologist conducted no psychological testing as part of his evaluation. *Id.* at 744. Dr. Dallara assessed Meadows with Depression NOS. *Id.*

In his functional assessment, Dr. Dallara indicated that Meadows would be able to understand and apply instructions in a work setting consistent with his low-average intellectual abilities. (R. 10, tr., at 744-745.) Dr. Dallara noted that: "No information was provided to suggest inappropriate comportment during his work history. However due to his depression, he may have some difficulties relating to others including fellow workers and supervisors." *Id.* at 745. Similarly, although Dr. Dallara noted that Meadows "did not report a pattern of inability to adjust to workplace demands," the psychologist opined that, "due to his depression, he may have some difficulties withstanding stress and pressure associated with day-to-day [work] activity." *Id.*

State agency reviewing psychologist, Cynthia Waggoner, Psy.D., determined on May 8, 2015, that Meadows had a mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence or pace. (R. 10, tr., at 185.) Dr. Waggoner completed a mental residual functional capacity assessment in which she found that Meadows was moderately limited in his ability to understand, remember and carry out detailed instructions. *Id.* at 189. The psychologist noted that Meadows reported trouble with memory and confusion, but he did retain the capacity to understand and apply instructions in a work setting consistent with his low average intellectual abilities. *Id.* Dr. Waggoner noted that, due to his depression and low average intellectual abilities, Meadows would likely have difficulty performing detailed tasks. *Id.* at 190. She observed, however, that there was no evidence of impairment of persistence or pace during the consultative examination; and, he retained the capacity to perform simple and routine tasks in a work setting. *Id.*

Dr. Waggoner indicated that Meadows was moderately limited in his ability to interact appropriately with the general public. (R. 10, tr., at 190.) The psychologist noted that Meadows reported feeling uncomfortable or unsafe around people, and due to his depression "he may have some difficulties relating to others." *Id.* She assessed that he retained the capacity for occasional interactions in a work setting. *Id.* Dr. Waggoner also indicated that Meadows was moderately limited in his ability to respond appropriately to changes in the work setting. *Id.* Due to his depression, she noted that Meadows may have some difficulties withstanding stress and pressure associated with day-to-day work activity, although he retained the capacity to adjust to minor changes. *Id.*

On reconsideration dated August 20, 2015, state agency reviewing psychologist, Vicki Warren, Ph.D., adopted Dr. Waggoner's above-referenced psychiatric review technique findings (mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence or pace). (R. 8, tr., at 227.) Dr. Warren's mental RFC assessment was also identical with Dr. Waggoner's assessment, with the sole exception that Dr. Warren indicated that the claimant's ability to maintain attention and concentration for extended periods was moderately limited (whereas Dr. Waggoner found it was not significantly limited). *Id.* at 231-233.

Shandi Rothman, LISW, completed a Medical Source Assessment (Mental) concerning Meadows on August 17, 2015. (R. 10, tr., at 858-860.) The social worker assessed that Meadows was unable to: maintain attention and concentration for extended periods of time; complete a normal workday and workweek without interruptions for psychologically-based symptoms; and, perform at a consistent pace without an unreasonable number of rest periods. *Id.* at 858. Rothman opined that Meadows would likely be absent from work more than four days per month as a result of his impairments. *Id.* at 859. In addition, Rothman estimated that the claimant would be off-task over 20% of the time during an 8-hour workday due to his mental health symptoms. *Id.* The social worker indicated that Meadows would need to take unscheduled breaks, beyond what would normally be anticipated in a work setting, more than four times a day. *Id.* Rothman concluded that Meadows struggled greatly with depression, due to multiple medical issues (heart, spine, joint), and would require frequent breaks. *Id.* at 860.

On September 3, 2015, Jenna Hartman, M.D., completed a medical statement on Meadows's physical ability to do work-related activities. (R. 10, tr., at 885-886.) Dr. Hartman

6

indicated that Meadows's ability to lift and carry a maximum of thirty pounds was affected by his limited range of motion in his back and left knee, his history of vertebral fracture, and spondylolisthesis. *Id.* at 885. The doctor indicated that Meadows could stand or walk a total of four hours of an 8-hour workday, for one hour at a time without interruption. *Id.* He could sit for a total of two hours of an 8-hour workday, for thirty minutes at a time without interruption, due to back pain and limited knee flexion secondary to a brace. *Id.* Dr. Hartman opined that Meadows could never climb, stoop, crouch, kneel, or crawl, and only occasionally balance. *Id.* The doctor indicated that Meadows's cardiogenic syncope and limited stability supported restrictions on his exposure to heights, moving machinery, temperature extremes, chemicals, fumes, humidity, and vibration. *Id.* She stated that claimant would miss work due to pain or fatigue more than four days per month, and he would be off-task over 20% of an 8-hour workday for the same reason. *Id.* at 886.

Dr. Hartman indicated that Meadows would need to lie down for two hours or more during the course of an 8-hour workday at a sedentary job. (R. 10, tr., at 886.) Meadows would need to take unscheduled work breaks, beyond standard breaks, more than four times per day. *Id.* Dr. Hartman stated that her opinion was supported by medical findings of degenerative changes in the knee and spine, cardiogenic syncope, and spondylolisthesis. *Id.*

Meadows had spinal fusion surgery on July 27, 2016, based on a diagnosis of left leg radiculopathy, L5-S1 spondylolisthesis, and L4-L5 disc herniation. (R. 10, tr., at 1715.) The primary procedure was a left L5-S1 transforaminal lumbar interbody fusion (TLIF), with a repair of a dural tear. *Id.* at 1375, 1715-1717.

Social worker Rothman completed a second Medical Source Assessment (Mental) concerning Meadows on February 22, 2017. (R. 10, tr., at 1388-1390.) She assessed that Meadows was unable to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and he was unable to perform at a consistent pace without an unreasonable number of rest periods. *Id.* at 1388. Rothman opined that Meadows would likely be absent from work more than four days per month due to his impairments. *Id.* at 1389. In addition, Rothman estimated that the claimant would be off-task over 20% of the time during an 8-hour workday due to his mental health symptoms. *Id.* The social worker indicated that Meadows would need to take unscheduled breaks, beyond standard breaks, about four times a day that would last 15-20 minutes. *Id.* Rothman concluded that Meadows would struggle to function due to his anxiety, and would require limited interaction with others due to PTSD. *Id.* Rothman opined that Meadows also struggles with memory and maintaining focus. *Id.* He has symptoms of depression that increased significantly due to multiple medical issues. *Id.* at 1390. In addition, Rothman opined that, due to the progression of his mental health and physical conditions, she could not recommend his working even limited hours. *Id.*

On March 5, 2017, Abdul-Rheem Ghanem, M.D., completed a medical statement on Meadows's physical ability to do work-related activities. (R. 10, tr., at 1414-1415.) Dr. Ghanem's statement was strikingly less restrictive than Dr. Hartman's in 2015. Dr. Ghanem indicated that MRI findings supported an assessment that Meadows could only lift or carry 15-20 pounds. *Id.* at 1414. The doctor assessed that Meadows could stand or walk for a total of 3-4 hours during an 8-hour workday. *Id.* Claimant's ability to sit was not impacted by his impairment. *Id.* Dr. Ghanem also indicated that Meadows could never climb, but could

frequently balance, and occasionally stoop, crouch, kneel, or crawl.  *Id.*  The doctor found

Meadows should not be exposed to moving machinery because he could be slow to move away

from such a hazard.  *Id.*  He did not find any other environmental restrictions.  *Id.*

Dr. Ghanem indicated that Meadows would miss work about one day per month due to

pain or fatigue, and he would be off-task for about 5% of a typical workday for the same reason.

(R. 10, tr., at 1415.)  Dr. Ghanem did not find that claimant would need to lie down at all during

the course of a workday.  *Id.*  The doctor assessed that Meadows might need to take one

unscheduled break while working at a sedentary job, because he may experience mild discomfort

from sitting in the same position for a prolonged period.  *Id.*  Dr. Ghanem noted that there was no

recent PT/OT evaluation on file, and that Meadows would benefit from a new evaluation with

treatment.  *Id.*

## IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his August 16,

2017, decision:

1.  The claimant meets the insured status requirements of the Social Security Act
through March 31, 2017.

2.  The claimant has not engaged in substantial gainful activity since October 20,
2012, the alleged onset date (20 C.F.R. 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  degenerative disc disease
of the lumbar spine, depressive disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525,
404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned  finds that the
claimant has the residual functional capacity to perform light work as defined in

9

20 CFR 404.1567(b) and 416.967(b) with the following additional limitations. The claimant must be able to change positions between sitting and standing twice per hour for two to three minutes at a time. The claimant can occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. The claimant can frequently balance and stoop. The claimant can occasionally kneel, crouch, and crawl. The claimant cannot work at unprotected heights, around moving mechanical parts, and cannot operate a motor vehicle. The claimant can tolerate occasional exposure to dust, odors, fumes, or other pulmonary irritants. The claimant can perform simple, routine tasks but not at a production rate pace. The claimant can make simple, work-related decisions. The claimant can tolerate occasional interactions with supervisors, coworkers, and the public. The claimant can tolerate few changes in a routine work setting defined as infrequent changes that are explained in advance.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on *** 1986, and was 26 years old, which is defined a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 20, 2012, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 10, tr., at 95, 96, 99, 104, 105.)

## V.  DISABILITY STANDARD

A claimant is entitled to receive POD, DIB or SSI benefits only when he establishes

disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A

claimant is considered disabled when he cannot perform "substantial gainful employment by

reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* §404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

## VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971)*.* "Substantial evidence"

has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

VII.  ANALYSIS

Meadows presents the two legal issues for the court's review, asserting the ALJ failed "to properly evaluate the opinions and statements of the treating sources" and "did not meet his burden at Step Five" in the sequential analysis. (R. 11, PageID #: 1871.)

A.  Treating Sources

Meadows argues that the ALJ failed to evaluate his treating sources' opinions consistent with the requirements of 20 C.F.R. § 404.1527. (R. 11, PageID #: 1871, 1888-1889.) Specifically, he contends that the ALJ erred when ascribing little weight to the opinions from Dr. Hartman and social worker Rothman, and partial weight to the opinion from Dr. Ghanem, while according great weight to the opinions from state agency reviewing physicians. *Id.* at 1889.

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians.[2] *Gayheart v. Commissioner,* 710 F.3d 365, 375 (6th Cir. 2013); *Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544. This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often able to provide a more complete picture of the individual's health and treatment history. *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The treating physician doctrine requires opinions from treating physicians to be given controlling weight when the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Gayheart,* 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley,* 581 F.3d at 406; *Wilson,* 378 F.3d at 544. In other words, treating physicians' opinions are only given deference when supported by objective medical evidence. *Vance v. Commissioner,* No. 07-5793, 2008 WL

---

[2] Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and apply to the evaluation of opinion evidence for claims filed before March 27, 2017. 82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017); *see, e.g.,* 20 C.F.R. § 404.1527 (2017) ("For claims filed ... before March 27, 2017, the rules in this section apply.") Plaintiff's claim was filed before March 27, 2017.

162942, at *3 (6th Cir. Jan. 15, 2008) (citing *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003)).

Social Security regulations require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s). *Blakley*, 581 F.3d at 406; *Vance*, 2008 WL 162942, at *3. Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Blakley*, 581 F.3d at 406-407. Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c), 416.927(c). Although the ALJ is directed to consider the factors, the ALJ is not required to provide an "exhaustive factor-by-factor analysis" in his decision. *Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).

In addition, an ALJ must evaluate each medical opinion in the record. *Smith v. Commissioner*, 482 F.3d 873, 875 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c). State agency doctors are considered highly-qualified experts in disability evaluation, and the ALJ must consider their evidence. 20 C.F.R. §§ 404.1513a(b)(1); 404.1527(e), 416.913a(b)(1); 416.927(e). Although the ALJ generally accords more weight to a treating source over those of a non-examining source, the ALJ is not prohibited from adopting the findings of a non-examining source. *See generally Ealy v. Commissioner*, 594 F.3d 504, 514-515 (6th Cir. 2010); *Smith*, 482 F.3d at 875.

Unless a treating source's opinion is given controlling weight, the ALJ is required to consider the following factors in deciding the weight to give any medical opinion: the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see generally Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 937. The ALJ, however, is not required to provide an "exhaustive factor-by-factor analysis" in the decision. *Francis*, 2011 WL 915719, at *3.

### 1. Dr. Hartman

The ALJ considered the September 2015 opinion from Dr. Hartman and gave it little weight. (R. 10, tr., at 102, citing *id.* at 885-886.) After summarizing the limitations set forth in the opinion, the ALJ stated:

> Dr. Hartman's opinion is inconsistent with the record because if the claimant were so limited as to require the off-task and absenteeism levels she describes, physical status examinations presumably would have shown signs of muscular atrophy and strength loss due to this alleged level of inactivity and physical limitation. Furthermore, Dr. Hartman statement is generally inconsistent with the most recent MRI and x-ray findings in this record, showing only mild degenerative changes in the lumbar spine, subsequent to the fusion procedure in July 2016 (36F9, 40F5). For these reasons, I give little weight to Dr. Hartman's opinion despite her treatment relationship with the claimant.

*Id.* Although the claimant argues that the ALJ's weighting of Dr. Hartman's opinion is erroneous, he does not explicitly state where the error lies. *See generally* R. 11, PageID #: 1889.

Meadows acknowledges the ALJ's statement that "recent MRI and x-ray findings . . . show[ed] only mild degenerative changes in the lumbar spine, subsequent to the fusion procedure." (R. 11, PageID #: 1889.) He contends that the February 2017 x-ray cited by the ALJ (R. 10, tr., at 1431 ("36F9")), showed moderate disc space narrowing at L5-S1, and mild to

moderate disc space narrowing at L4/5. (R. 11, PageID #: 1889.) The above-quoted section from the ALJ's decision also indicates consideration of earlier x-rays of the lumbar spine performed on October 14, 2016, that showed no significant intervertebral body disc space narrowing. (R. 10, tr., at 1700 ("40F5").) The radiologist's impression was there were stable post-surgical changes of the prior fusion at L5-S1, with intact surgical hardware. *Id.* There were no acute findings. *Id.* The court is mindful, however, that courts reviewing social security disability appeals do not review the evidence *de novo* or resolve conflicts in the evidence. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Meadows has not shown that the ALJ erred by not considering the opinion and pertinent medical records. Nor has he shown that substantial evidence fails to support the ALJ's finding that the cited records indicate no more than mild degenerative changes overall, which is inconsistent with the above opinion, and constitutes good reasons for discounting it.

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying the aforementioned regulatory factors. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 937; 20 C.F.R. §§ 404.1527(c), 416.927(c). Here, the ALJ considered Meadows's treatment relationship with Dr. Hartman, and the nature and extent of the treatment relationship. (R. 10, tr., at 102.) The ALJ also addressed the consistency of the opinion with the record as a whole. *Id.* The court, therefore, finds that the ALJ adequately addressed the Section 404.1527(c) and 416.927(c) factors.

## 2. Dr. Ghanem

The ALJ considered the March 2017 opinion from Dr. Ghanem and gave it partial weight.  (R. 10, tr., at 102-103, citing *id.* at 1414-1415.)  After summarizing the limitations set forth in his opinion, the ALJ stated:

> The claimant reported that he had treated with Dr. Ghanem only four times, approximately, representing a limited treating relationship on which to form an opinion about the claimant's functioning levels.  Moreover, as with the opinion of Dr. Hartman, these statements about time off task and unscheduled breaks are not well supported with citation to objective findings or signs.  Given the limited treatment relationship with the claimant and the unsupported statements about time off task and need for an unscheduled break during a workday, I afford Dr. Ghanem's opinion only some partial weight.

(R. 10, tr., at 103.)  Meadows contests the ALJ's statement that Dr. Ghanem had a limited treatment relationship with the claimant, stating that the doctor was a physician at Summa Barberton Family Practice, which had treated Meadows since March 2015.  (R. 11, PageID #: 1889, citing MER.)

A treating physician is defined as a physician who has provided medical treatment or evaluation, and who has an "ongoing treatment relationship" with the patient.  *Daniels v. Commissioner*, No. 04-5709, 2005 WL 2739084, at *5 (6th Cir. Oct. 24, 2005) (citing 20 C.F.R. § 404.1502); *Bryant v. Astrue*, No. 2:09-00093, 2010 WL 2901842, at *2 (M.D. Tenn. July 19, 2010) (citing 20 C.F.R. § 416.902).  For example, in finding that the treating physician relationship cannot arise from a single visit, the Sixth Circuit noted that the treating physician doctrine is "based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

Indeed, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Kornecky v. Commissioner*, No. 04-2171, 2006 WL 305648, at *9 (6th Cir. Feb. 9, 2006); *see also Rueda v. Berryhill*, No. 1:17CV1878, 2018 WL 3304626, at *14 (N.D. Ohio June 22, 2018), *adopted by* 2018 WL 3302928 (N.D. Ohio July 5, 2018) (citing cases); *Hickman v. Colvin*, No. 1:13CV00089, 2014 WL 2765670, at *12 (M.D. Tenn. June 18, 2014), *adopted by* 2014 WL 3404967 (M.D. Tenn. July 10, 2014) ("Precedent in this Circuit suggests that a physician who treats an individual only twice or three times does not constitute a treating source," citing cases).

The lack of an ongoing treatment relationship can be evidenced not only by a small number of visits, but also by a brief period of time during which the doctor treated the patient. For example, in *Kepke v. Commissioner*, the Sixth Circuit found it was not improper for the ALJ to discount a doctor's opinion on the basis that he treated the claimant only three times over a three-month period. *Kepke v. Commissioner*, No. 15-1315, 2016 WL 124140, at *4 (6th Cir. Jan. 12, 2016); *see also Helm v. Commissioner*, No. 10-5025, 2011 WL 13918, at *3 n.3 (6th Cir. Jan. 4, 2011) (doctor examined patient only three times over a four-month period).

Although claimant is correct that treatment records indicate that Meadows had been a patient at that practice since early 2015, the records also show that Dr. Ghanem himself had only seen Meadows for a brief eight-week period before rendering his opinion on March 5, 2017. *See* R. 10, tr., at 1298-1302 (January 10, 2017), 1453-1460 (January 23), 1439-1443 (February 20), and, 1434-1438 (March 3); *see also id.* at 1414-1415 (March 5, 2017, opinion). The two January visits concerned anal bleeding that Meadows had been experiencing, and the February visit was a preoperative screening in advance of gall bladder surgery scheduled for the following week. *Id.*

The March 3, 2017, visit was apparently for the sole purpose of having the doctor complete disability paperwork. *See* R. 10, tr., at 1434 ("Patient here for disability form to be filled out .... patient wanted to have it filled out in person.") Although Meadows stated he was disabled due to back surgery and chronic back pain, the record indicates he limited the extent of the back exam on the March 3rd visit, and did not want to do any flexion or extension. *Id.* at 1434, 1436.

Substantial evidence supports the ALJ's finding that Dr. Ghanem had a limited treatment relationship with the claimant, because the record shows that the doctor did not have a sufficient ongoing treatment relationship with the claimant to support application of the treating physician rule; and, his opinion is not entitled to any special degree of deference. *Kepke*, 2016 WL 124140, at *4; *Mireles v. Commissioner*, No. 14-2471, 2015 WL 4503502, at *2 (6th Cir. July 24, 2015) (per curiam); *Helm*, 2011 WL 13918, at *3 n.3; *Daniels*, 2005 WL 2739084, at *5.

An ALJ must still evaluate the medical opinion by applying pertinent factors to decide the weight to assign the opinion. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 937; 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ considered the length of Meadows's relationship with Dr. Ghanem, and the nature and extent of the treatment relationship. (R. 10, tr., at 103-104.) The ALJ also addressed the supportability of Dr. Ghanem's opinion. *Id.* The court finds that the ALJ adequately addressed the Section 404.1527(c) and 416.927(c) factors.

### 3. Ms. Rothman

The ALJ considered the opinions from "treating counselor" (social worker) Rothman, and gave them little weight. (R. 10, tr., at 103, citing *id.* at 858-860, 1388-1390.) After summarizing the limitations set forth in her opinions, the ALJ stated:

> I give little weight to these opinions of Ms. Rothman because they are not
> accompanied by much in the way of narrative support with citation to clinical

signs of cognitive, behavioral, or occupational deficit. Her assessments appear to rely primarily on what the claimant has told her in counseling sessions, ultimately constituting subjective evidence only.

*Id.* Although the claimant argues that the ALJ's weighting of Rothman's opinion is erroneous, he does not explicitly state where the error lies. *See generally* R. 11, PageID #: 1889-1890. Meadows simply states that Rothman met with the claimant on a regular basis for counseling, and compiled "extensive treatment notes." *Id.* at 1890. This argument does not address the ALJ's concern that Rothman's opinions were not supported by clinical findings, but rather on Meadows's subjective statements during counseling.

In addition, a social worker is not considered an "acceptable medical source" under Social Security regulations. *Payne v. Commissioner*, No. 08-4706, 2010 WL 4810212, at *9 (6th Cir. Nov. 18, 2010); *see also Marijanovic v. Commissioner*, No. 17-1282, 2017 WL 8231367, at *1 (6th Cir. Oct. 30, 2017); *Gooding v. Berryhill*, No. 5:16CV2100, 2017 WL 9478428, at *9 (N.D. Ohio June 22, 2017), *adopted by* 2017 WL 3224572 (N.D. Ohio July 31, 2017) (citing cases). It follows, then, that because Rothman is a social worker and not an "acceptable medical source" within the meaning of the regulations, she cannot render a "medical opinion." 20 C.F.R. §§ 404.1502(a), 404.1527(a)(1), 416.902(a), 416.927(a)(1). Moreover, under the regulations, social workers not only fail to qualify as an "acceptable medical source," they are not considered "medical sources." *Gooding*, 2017 WL 9478428, at *9. Thus, an ALJ is not required to give any special deference to a social worker's report. *See generally Kilburn v. Commissioner*, No. 1:17CV603, 2018 WL 4693951, at *11 (S.D. Ohio Sept. 29, 2018).

Nevertheless, the ALJ should generally explain the weight given to opinions from these sources, such that a reviewer is able to follow the ALJ's reasoning. *Marijanovic*, 2017 WL

8231367, at *1; *Gooding*, 2017 WL 9478428, at *9.  As quoted above, the ALJ analyzed Rothman's opinion and articulated a sufficient explanation for the weight assigned.  The court finds no error.

### 4.  Dr. Dallara

The claimant recognizes that the ALJ accorded significant weight to the consultative examiner Dr. Dallara, but contends that the ALJ "did not address" Dr. Dallara's findings that he "may have some difficulties relating to others including fellow workers and supervisors," and "due to his depression, he may have some difficulties withstanding stress and pressure associated with day-to-day [work] activity."  (R. 11, PageID #: 1890, citing R. 10, tr., at 745.)  The ALJ's decision, however, includes the above quoted language in its discussion of Dr. Dallara's opinion. (R. 10, tr. at 103) The ALJ found the doctors opinion "somewhat vague" but it suggested the "potential limitations will be moderate in nature."  *Id.*  The ALJ further found it "consistent with the claimant's apparent ability to occasionally babysit multiple small children for a friend, and with the claimant's normal social presentations at numerous medical examinations documented in this record."  *Id.* (citing record ex. 5F3-5).

Moreover, Meadows's argument fails to recognize that Dr. Dallara also indicated that no information was provided to suggest inappropriate comportment during his work history, and that the claimant did not report a pattern of inability to adjust to workplace demands, nor did he describe a history or mental or emotional deterioration in response to work pressures.  (R. 10, tr., at 745.)  The court finds that the ALJ's assigned RFC[3] satisfactorily accounts for the moderate

---

[3] A claimant's RFC is an indication of an individual's work-related abilities *despite* their limitations.  *See* 20 C.F.R. §§ 404.1545(a).  Moreover, a claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner, and "[i]f the treating

limitations that Dr. Dallara indicated the claimant "may have" in responding appropriately in a work setting. The RFC limited claimant to occasional interactions with others, and few changes, explained in advance, in a routine work setting. *See* R. 10, tr., at 99, 745.

After considering Meadows's various arguments, the court finds that the ALJ properly evaluated the opinions and statements of the above-referenced providers. As explained, Meadows's arguments lack merit.

### B. Step Five

Meadows also contends that the ALJ did not meet his burden at Step Five of the sequential evaluation. (R. 11, PageID #: 1871, 1893-1895.) He argues that the ALJ's findings were not supported by substantial evidence at Step Five because the decision omitted his alleged needed for a cane while walking and standing. *Id.* at 1895. Meadows takes issue with the ALJ's determination that the evidence did not support the need for a cane to walk, "because such a device has not been prescribed by treating providers per this record, and because the record evidences that claimant [is] able to ambulate without the cane." *Id.* at 1893-1894, citing R. 10, tr., at 101.

While framing his arguments as an alleged error at Step Five,[4] the crux of Meadows's argument is that the ALJ should have included the use of a cane in his RFC determination. The

---

physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, ***the claimant's RFC***, or the application of vocational factors—his decision need only 'explain the consideration given to the treating source's opinion." *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471 (6th Cir. 2014) (emphasis added) (*quoting Johnson v. Comm'r of Soc. Sec.*, 535 Fed. Appx. 498, 505 (6th Cir. 2013) (internal citations omitted)).

[4] At the fifth step of the analysis, the ALJ determines whether based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other

determination of a claimant's RFC is a determination made at steps one through four, when the claimant is proving the extent of his impairments. *Her*, 203 F.3d at 391. "The step five analysis is meant to determine, given the severity of the impairments already proven, whether there are jobs in the economy which a claimant can perform." *Id.* What Meadows is actually challenging here is the alleged failure of the RFC to include all the limitations Meadows believes should have been included. *See, e.g.*, *Quisenberry v. Commissioner*, No. 17-2408, 2018 WL 6264566, at *10 (6th Cir. Nov. 29, 2018).

Meadows's brief, however, does not address Social Security Ruling 96-9p ("SSR 96-9p") that requires clear medical evidence before the need for a cane may be incorporated into an RFC. SSR 96-9p, 1996 WL 374185 (Jul. 2, 1996), provides as follows:

> **Medically required hand-held assistive device**: *To find that a hand-held assistive device is medically required, there **must** be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, **and** describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).* The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p (emphasis added).

The ALJ's decision discussed Meadows's cane use in several different passages, indicating:

---

work, in which case the claimant is not disabled. 20 C.F.R. § § 404.1520(a)(4)(v), 416.920(a)(4)(v). Although the claimant bears the burden of proof during the first four steps, the burden shifts to the Commissioner at step five. *Walters*, 127 F.3d at 529. Moreover, at the fifth step, the Commissioner must prove that there is work available in the national economy that the plaintiff could perform. *Her v. Commissioner*, 203 F.3d 388, 391 (6th Cir.1999) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

Physical status examinations after the lumbar surgery also indicate the claimant has greater capacity for exertional activity than he has alleged. The claimant has shown ability to walk without the use of an ambulatory aide, contradicting his testimony that he essentially cannot walk without the cane unless he has something else he can hold on to (34F1). I also note that the record does not reflect any records of a prescription for the claimant's used cane. In fact, when the claimant first started presenting with the cane at appointments, examiners noted that even without the cane, his mobility had increased, his leg pain had resolved, and he was able to ambulate independently (e.g., 38F3). That the claimant has been able to get on and off of examination tables, albeit slowly, of his own accord also suggests some residual ability to move about, bear weight on his legs, and generally perform greater than sedentary work (34F1). The claimant presenting to appointments walking without assistance and carrying a duffel bag is but another recorded instance in this record that is inconsistent with his claims of serious reliance on a cane to ambulate, and generalized weakness (34F1).[5]

\*\*\*

I note that the evidence does not support the claimant's alleged reliance on a cane to ambulate because such a device has not been prescribed by treating providers per this record, and because the record evidences the claimant able to ambulate without the cane, contradicting his testimony that he cannot do so (e.g., 34F1, 38F3). I also find that the claimant's reports that he spends most of his time in bed are not consistent with the record because if that were true, the record would show signs of muscular atrophy in the lower extremities and lower back, which it does not (e.g., 10F14).

(Tr. 100, 101).

Meadows takes issue with the ALJ's finding, and asserts that a prescription for a cane does exist in the medical record. (R. 11, PageID #: 1894, citing R. 10, tr., at 1533.) Specifically, on March 19, 2017, Meadows presented at the Emergency Department as a result of a slip and fall on the last two steps of a staircase. (R. 10, tr., at 1484, 1499-1500.) Upon discharge, he was prescribed a platform cane with a 4-point stand. (Tr. 1533.)

---

[5] Dr. Ghanem's March 5, 2017, medical statement noted that "Patient [is] able to walk in the clinic hallway with normal gait & carries a duffel bag and maintains balance." (R. 10, tr., at 1414 ("34F1").

Arguably, the ALJ was incorrect in finding that the record was devoid a cane prescription. Nevertheless, it does not follow that the ALJ erred by finding that a cane was not "medically required" as described in the pertinent SSR 96-9p, which contains two requirements before an ALJ may conclude that a hand-held assistive device is "medically required." First, there must be medical documentation establishing the need for said device to aid in walking/standing; and second, the medical documentation must also "describ[e] the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.)" 1996 WL 374185 at *7.[6]

Assuming the March 19, 2017 prescription was sufficient to establish the first part of the SSR 96-9p test, none of the medical documentation cited by the claimant "describe[es] the circumstances for which [a cane] is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."[7] (R. 13, citing tr.

---

[6] A Plaintiff's testimony alone is insufficient under Social Security Ruling ("SSR") 96-9p, 1996 WL 374185 (Jul. 2, 1996). *See, e.g., Mitchell v. Comm'r of Soc. Sec.*, No. 4:13cv1969, 2014 WL 3738270 (N.D. Ohio Jul. 29, 2014) (finding that Plaintiff's testimony did not qualify as "medical documentation establishing the need" for the cane under SSR 96-9p) (Pearson, J.); *Smith v. Astrue*, No. 2:11-0065, 2012 WL 4329007 at *8 (M.D. Tenn. July 16, 2012), *report and recommendation adopted*, 2012 WL 4328993 (M.D. Tenn. Sept. 20, 2012) ("Even if the ALJ had not discussed the use of the cane, Plaintiff failed to provide medical documentation of its requirement. The only evidence supporting a cane requirement comes from Plaintiff's testimony.")

[7] While the court has reviewed pertinent portions of the over 1,800-page transcript identified by the parties, it has not found any medical documentation that could reasonably be construed as describing the circumstances for which a cane is needed. Nevertheless, the onus remains on Plaintiff and not the court to identify evidence supporting his assignments of error. *See, e.g., Paul v. Comm'r of Soc. Sec.*, No. 2:13cv14911, 2015 WL 1299980 at *1 (E.D. Mich. Mar. 23, 2015) ("[P]laintiff cannot simply make bald claims that the ALJ erred, while leaving it to the Court to scour the record to support this claim."); *Nash v. Comm'r of Soc. Sec.*, No. 1:12 CV 2234, 2013 WL 4736736, at *3 (N.D. Ohio Sept. 3, 2013) ("it is not this Court's function to

1425, 1483, 1488, 1533, 1778, 1781, 1787, 1790, 1792, 1795). *See, e.g., Perry v. Berryhill*, No. 1:16CV2970, 2018 WL 1393275, at *4 (N.D. Ohio Mar. 20, 2018) ("Nor does Plaintiff cite to any medical records describing the circumstances for which a cane is needed as required by SSR 96–9p.") (Limbert, M.J.) (*citing Parrish v. Berryhill*, No. 1:16CV1880, 2017 WL 2728394 (N.D. Ohio June 8, 2017)).  It further bears noting that all cane-related medical records cited by Meadows cover a less than two-month time span between his fall on March 19, 2017 and May 16, 2017.[8]

Meadows also argues that the ALJ's hypothetical questions did not accurately portray his limitations.  (R. 11, PageID #: 1894-1895.)  A hypothetical question to the vocational expert must accurately portray the claimant's physical limitations.  *Pasco v. Commissioner of Social Sec.*, No. 03-4358, 2005 WL 1506343, at *14 (6th Cir. June 23, 2005); *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) (citing cases).  However, hypothetical questions need only incorporate those limitations which the ALJ has accepted as credible.  *Parks v. Social Sec. Admin.*, No. 09–6437, 2011 WL 867214, at *9 (6th Cir. March 15, 2011); *Murphy*, 2013 WL 829316, at *10.  If the ALJ does not find that a cane would be medically necessary, then the ALJ is not required to include it in a hypothetical to the VE.  *Murphy*, 2013 WL 829316, at *10 (citing *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Further, when a cane is not

---

scour the administrative record and craft arguments on Plaintiff's behalf."); *Crocker v. Comm'r of Soc. Sec.*, No. 1:08cv1091, 2010 WL 882831 at *6 (W.D. Mich. Mar. 9, 2010) ("This court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments.")

[8] The lone exception is a treatment note from February of 2017 by Dr. Gasser indicating that patient was "back home" and "using [a] cane mostly now for ambulation," but without noting whether the cane was actually prescribed. (Tr. 1488).

a necessary device for the claimant's use, it cannot be considered an exertional limitation that reduces claimant's ability to work. *Carreon v. Massanari*, No. 01-3552, 2002 WL 31654581, at *2 (6th Cir. Nov. 21, 2002); *Grimes*, 2018 WL 2305723, at *3 (citing *Carreon*); *Murphy v. Astrue*, No. 2:11CV00114, 2013 WL 829316, at *10 (M.D. Tenn. Mar. 6, 2013), *adopted by* 2013 WL 4501416 (M.D. Tenn. Aug. 22, 2013).

Because Meadows has failed to demonstrate the medical documentation of record shows a hand-held assistive device is medically required under SSR 96-9p, his argument that the ALJ erred by omitting the need for a cane in the RFC is not well taken.

## VIII. CONCLUSION

For the foregoing reasons, the court finds that the ALJ's decision is based on substantial evidence in the record, as outlined in his findings and supported by medical evidence. Accordingly, that decision is affirmed.

IT IS SO ORDERED.


<u>s/ David A. Ruiz</u>
David A. Ruiz
United States Magistrate Judge


Date: <u>September 27, 2019</u>